IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:06-CV-468-D

CHARLENE ROSS,                    )
                                  )
            Plaintiff,            )
                                  )
      v.                          )          **ORDER**
                                  )
WASHINGTON MUTUAL BANK,           )
                                  )
            Defendant.            )

On August 22, 2006, plaintiff Charlene Ross ("Ross") filed this action in Wake County

District Court against defendant Washington Mutual Bank ("WaMu") concerning a negative trade

line that WaMu had placed on one or more of Ross' consumer credit reports. Ross alleges common

law defamation and violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 et

seq., and the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat.

§§ 75-1.1 et seq. On November 8, 2006, WaMu removed the action to this court. On November 16,

2007, WaMu filed a motion for summary judgment. Thereafter, Ross responded, and WaMu replied.

As explained below, defendant's motion for summary judgment is granted.

I.

The court reviews the facts in the light most favorable to Ross, the non-moving party. See,

e.g., United States v. Diebold, 369 U.S. 654, 655 (1962) (per curiam). At all times relevant, WaMu

held as assignee a promissory note and deed of trust that James Williams ("Williams") executed on

or about May 8, 1996, in favor of Marsh Associates, Inc. Compl. ¶ 6; Def.'s Mot. for Summ. J. Ex.

P, Nicassio Aff. ¶ 4 [hereinafter "Nicassio Aff."]. The promissory note encumbered real property

located at 4501 Munsee Street in Charlotte, North Carolina. Compl. ¶ 7; Nicassio Aff. ¶ 4. On or

about August 16, 1996, Williams quitclaimed his interest in the mortgaged property to Ross, and the

two married the following month. Compl. ¶¶ 9–10. In April 2001, Ross obtained a domestic violence protective order evicting Williams from the property. See id. ¶ 11; Def.'s Mot. for Summ. J. Ex. R, Ross Dep. 46:6–47:3, June 22 & 27, 2005 [hereinafter "First Ross Dep."]. In May 2001, Ross obtained another domestic order naming Ross as the property's sole owner. See First Ross Dep. 47:6–20; Nicassio Aff. Ex. 4. Williams, however, remained responsible for the mortgage. See Compl. ¶ 14. Shortly thereafter, Ross contacted WaMu to discuss the mortgage. In July 2001, Ross spoke with a WaMu representative to confirm that she would get credit for any mortgage payments she made going forward. First Ross Dep. 75:15–76:4, 89:1–3, 158:1–4. Ross also requested monthly mortgage statements and an IRS 1098 form which would entitle her to a tax deduction for mortgage interest she paid. See id. at 83:17–84:6, 89:4–90:14. To that end, Ross sent WaMu copies of her social security card, the May 2001 domestic order, and the August 1996 quitclaim deed. Nicassio Aff. ¶ 6. As a result of these events, WaMu mistakenly changed the mortgage to Ross' name and sent a letter to the U.S. Department of Housing and Urban Development ("HUD") on July 27, 2001, noting the change. Def.'s Mot. for Summ. J. Ex. S, Ross Dep. 140:19–141:21, July 11–12, 2007 [hereinafter "Second Ross Dep."] & Ex. 28.

Neither Ross nor Williams made mortgage payments for June through September 2001, and the loan went into default. Nicassio Aff. ¶ 8. On September 11, 2001, plaintiff discovered that WaMu had placed a negative trade line on one or more of her consumer credit reports based on the mistaken belief that she was responsible for the defaulted mortgage. Compl. ¶ 16; Second Ross Dep. 63:5–13. Plaintiff contacted WaMu, and WaMu indicated that it had "no details as to why [Williams'] name was changed." Second Ross Dep. 63:14–18; Pl.'s Opp'n to Mot. for Summ. J. Ex. 3, WAMU-107 (phone records) [hereinafter "WAMU-__"]. Plaintiff contacted the consumer reporting agencies ("CRAs") to dispute the reporting, but the CRAs confirmed the validity of the mortgage based on the negative trade line placed by WaMu. Second Ross Dep. 63:19–64:18; Nicassio Aff. ¶ 10.

2

In October 2001, WaMu referred the mortgage to foreclosure. Nicassio Aff. ¶ 8. However, in February 2002, Ross agreed to reinstate the mortgage, and made eight months of past-due mortgage payments. Id.

On or about September 27, 2002, Ross contacted WaMu to report that the loan still appeared on her credit reports. WaMu investigated the issue, admitted that it was mistakenly reporting the loan to the CRAs, and suspended credit-reporting for the loan through October 2003. See Nicassio Aff. ¶ 11; WAMU-102 (phone records). WaMu confirmed these actions in a letter to Ross. See WAMU-123. In June 2003, Ross and Williams again ceased making payments on the loan. Nicassio Aff. ¶ 14.

On August 4, 2003, Ross notified WaMu that one of the CRAs still reported that she had a loan with WaMu. See id. ¶ 12. WaMu conducted another investigation and asked the CRA to delete the loan information from Ross' credit profile. Id. On August 7, 2003, Ross reiterated to WaMu that she was not responsible for the loan. See WAMU-095 (consolidated notes log). WaMu noted in its records, "[w]e reported this on her credit report which we cannot as she does not have note liability. We corrected the credit reports and she will no longer be reported as having a loan w/ WAMU." Id. Nonetheless, one CRA continued to report the loan on Ross' consumer credit report. Second Ross Dep. 80:2–11 & Ex. 17. Ultimately, the CRA removed the loan from Ross' credit report, and the loan has not appeared on Ross' credit reports since December 31, 2003. See First Ross Dep. 120:14–2; Second Ross Dep. 135:3–138:3.

As a result of the negative trade line, Ross was denied credit on at least four occasions. See Compl. ¶ 30; Def.'s Mot. for Summ. J. Ex. Q, Resp. to Interrogs. 5–6 [hereinafter "Pl.'s Resp. to Interrogs."]. Ross believes that she missed the "business opportunity of a lifetime" — opening and operating an assisted-living facility — that would have netted her over $3,000,000 in profits each year. See Compl. ¶ 30; Second Ross Dep. 245:17–246:5. To put this allegation in context, it is important to note what else was going on in Ross' life.

Between 2001 and 2003, Ross worked as a high-school teacher in the Charlotte-Mecklenburg School system ("CMS"). In late 2003, Ross filed two charges of employment discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that CMS employees illegally discriminated against her in violation of Title VII. Second Ross Dep. 34:25–48:10 & Exs. 7, 9 (EEOC charges filed on Oct. 24, 2003 and Dec. 4, 2003). The EEOC rejected Ross' charges. Id. at 47:5–16, 48:11–49:1 & Exs. 8, 10 (EEOC notice of rights letters dated Sept. 29, 2004). As a result of her difficulties at CMS, which included an alleged threat from a student gang member's family, Ross sought treatment from psychiatrist Dr. Zofia Bochacki for post-traumatic stress disorder ("PTSD") and depression. Def.'s Mot. for Summ. J. Ex. V, Dr. Bochacki Dep. 10:6–13, 53:7–22, 55:15–21, 68:15–18 [hereinafter "Dr. Bochacki Dep."]. Ross also developed carpal tunnel syndrome. Second Ross Dep. 14:6–11. Because of her injuries, Ross filed workers' compensation claims against CMS alleging PTSD and carpal tunnel syndrome, and the parties entered a compromise settlement agreement and release for $35,000. Id. at 27:14–28:25 & Ex. 5 (compromise settlement agreement and release dated Aug. 23, 2005). Ross has not worked since November 2003. Id. at 13:10–19.

Also between 2001 and 2003, WaMu placed collection calls to plaintiff at her home and at the school where she worked. See Pl.'s Opp'n to Mot. for Summ. J. 7–9 [hereinafter "Pl.'s Mem."]; First Ross Dep. 201:20–211:7, 223:21–230:22. At the height of the phone calls, Ross received numerous calls daily from the early morning to late evening. First Ross Dep. 203:8–12

In February 2004, WaMu commenced foreclosure proceedings on the defaulted mortgage. See Def.'s Mot. for Summ. J. Ex. A (notice of foreclosure hearing). In March and April 2004, the substitute trustee posted and published notices. See Def.'s Mot. for Summ. J. Ex. C (order permitting foreclosure). WaMu also notified the insurer of the property to request cancellation of a hazard insurance policy that it held on the property. Second Ross Dep. 141:22–142:15 & Ex. 29.

4

On May 21, 2004, Ross filed suit against WaMu in Mecklenburg County Superior Court seeking to enjoin the foreclosure and alleging UDTPA claims against WaMu. See Def.'s Mot. for Summ. J. Ex. K (complaint filed May 21, 2004) [hereinafter "May 2004 Complaint"]. The Mecklenburg County Superior Court denied Ross' motion for a preliminary injunction, and Ross did not appeal. See Def.'s Mot. for Summ. J. Ex. L. In May 2004, the trustee sold the Munsee Street property. See Def.'s Mot. for Summ. J. Ex. G. On August 25, 2005, during a discovery-sanctions hearing on Ross' alleged failure to respond to WaMu's requests for production, Ross voluntarily dismissed her lawsuit against WaMu without prejudice. See Def.'s Mot. for Summ. J. Exs. M, N, & O.

On August 22, 2006, Ross filed this lawsuit in Wake County District Court alleging common law defamation and violations of the FCRA and UDPTA. Plaintiff seeks actual, statutory, and punitive damages to compensate for her wrongfully damaged credit scores, emotional distress, poor health, lost income, and lost business opportunities. Compl. ¶¶ 30, 36–38. On November 8, 2006, WaMu removed the action to this court. After discovery closed, WaMu moved for summary judgment.

II.

Summary judgment may be granted when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Fed. R. Civ. P. 56(c). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation omitted & emphasis removed).

5

III.

As for Ross' FCRA claim under 15 U.S.C. §§ 1681n and 1681*o*, plaintiff concedes that the two-year statute of limitations under 15 U.S.C. § 1681p bars her claim. See Pl.'s Mem. 2. Ross also concedes that the savings provision of Rule 41 of the North Carolina Rules of Civil Procedure, N.C. Gen. Stat. § 1A-1, does not extend the statute of limitations for her FCRA claim. See id. Accordingly, WaMu's motion for summary judgment is granted on Ross' FCRA claim.

IV.

As for Ross' UDTPA claim, plaintiff appears to allege two separate UDTPA violations: (1) a violation of N.C. Gen. Stat. § 75-1.1 for WaMu's alleged reporting of false loan information to CRAs; and (2) a violation of Article 2 of the UDTPA, the North Carolina Debt Collectors Act ("NCDCA"), N.C. Gen. Stat. §§ 75-50 et seq., for WaMu's alleged unfair debt collection practices.

A.

The court turns first to plaintiff's UDTPA claim under N.C. Gen. Stat. § 75-1.1 for WaMu's alleged reporting of false loan information to CRAs. WaMu contends that 15 U.S.C. § 1681t(b)(1)(F) of the FCRA preempts this claim. Ross responds that her UDTPA claim under section 75-1.1 is based on WaMu's providing false loan information to CRAs with malice; therefore, another provision of the FCRA (15 U.S.C. § 1681h(e)) authorizes her section 75-1.1 UDTPA claim.

Initially, the court examines WaMu's preemption argument under section 1681t(b)(1)(F). Congress enacted the FCRA in 1970, and it became effective in 1971. "Its provisions provide for the protection of the reputation of the consumer while recognizing the legitimacy of credit reports as a necessary adjunct of commerce for consumer credit, personnel matters, insurance, and other needed information." Thornton v. Equifax, Inc., 619 F.2d 700, 703 (8th Cir. 1980). The FCRA prohibits a "person" from furnishing information "relating to a consumer" to a CRA "if the person knows or consciously avoids knowing that the information is inaccurate." 15 U.S.C. § 1681s-2(a)(1)(A). The FCRA imposes a duty on a "furnisher of information" to investigate, correct, and

update information after receiving notice of a dispute or inaccuracy. Id. § 1681s-2(b). WaMu falls within the definition of a "person" under the FCRA and is a "furnisher of information" as that term is used in the FCRA. See id. §§ 1681a(b), 1681s-2.[1]

In 1970, Congress included in the FCRA 15 U.S.C. § 1681t, which discussed the role of state laws, and (as a general matter) permitted state regulation consistent with the FCRA. See Fair Credit Reporting Act of 1970, Pub. L. No. 91-508, § 622, 84 Stat. 1114, 1136 (codified as amended at 15 U.S.C. § 1681t(a)). Section 1681t(a) provides:

> Except as provided in subsections (b) and (c) of this section, this subchapter does not annul, alter, affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to the collection, distribution, or use of any information on consumers, or for the prevention or mitigation of identity theft, except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency.

15 U.S.C. § 1681t(a).

In 1996, as part of the Omnibus Consolidated Appropriations Act, Congress enacted the Consumer Credit Reporting Reform Act to amend portions of the FCRA. See Consumer Credit Reporting Reform Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, 3009-426 to -454. As part of that 1996 Act, Congress added subsections (b) through (d) to section 1681t. See § 2419, 110 Stat. at 3009-452 to -454. These subsections include preemption provisions to section 1681t(a)'s general allowance of state regulation consistent with the FCRA. See id.; see generally Michael Epshteyn, The Fair and Accurate Credit Transactions Act of 2003: Will Preemption of State Credit Reporting Laws Harm Consumers?, 93 Geo. L.J. 1143, 1150–58 (2005) (discussing the legislative history of the FCRA and amendments to the FCRA in 1996 and 2003). WaMu relies on the preemption

---

[1]The FCRA uses the term "furnishers of information" but does not define it. See, e.g., 15 U.S.C. § 1681s-2 ("Responsibilities of furnishers of information to consumer reporting agencies"). The term "furnishers of information" is generally understood to include various types of creditors, such as banks and other lenders, that provide credit information about their customers to other entities that issue consumer reports about the customers' credit worthiness. See, e.g., DiMezza v. First USA Bank, Inc., 103 F. Supp. 2d 1296, 1299 (D.N.M. 2000).

7

provision in section 1681t(b)(1)(F) to argue that plaintiff's UDTPA claim under section 75-1.1 is preempted.

Section 1681t(b)(1)(F) provides in pertinent part:

> No requirement or prohibition may be imposed under the laws of any State . . . with respect to any subject matter regulated under . . . section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies . . . .

15 U.S.C. § 1681t(b)(1)(F).[2] Section 1681s-2 describes the responsibilities of furnishers of information to CRAs. Subsection 1681s-2(a) describes the duty of furnishers of information to provide accurate information. See id. § 1681s-2(a). Subsection 1681s-2(b) describes the duty of furnishers of information to correct and update information. See id. § 1681s-2(b).[3] Because

---

[2]There are two exceptions to section 1681t(b)(1)(F)'s preemption provision. Neither exception applies in this case. For a discussion of these exceptions, see Islam v. Option One Mortgage Corp., 432 F. Supp. 2d 181, 186–89 (D. Mass. 2006).

[3]Section 1681s-2(b) states:

After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall —
(A) conduct an investigation with respect to the disputed information;
(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;
(C) report the results of the investigation to the consumer reporting agency;
(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly —
(i) modify that item of information;
(ii) delete that item of information; or
(iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b).

plaintiff's UDTPA claim under section 75-1.1 attempts to use the UDTPA to impose a "requirement or prohibition" under North Carolina law "with respect to any subject matter regulated under . . . section 1681s-2 of [the FCRA], relating to the responsibilities of persons who furnish information to [CRAs]," section 1681t(b)(1)(F) preempts plaintiff's UDTPA claim under section 75-1.1 for providing false loan information to CRAs. See id. § 1681t(b)(1)(F); cf. id. § 1681s-2(b).

In opposition to this conclusion, plaintiff cites another provision of the FCRA, 15 U.S.C. §1681h(e), and argues that section 1681h(e) authorizes her UDTPA claim under section 75-1.1. Congress enacted section 1681h(e) in 1970. See § 610, 84 Stat. at 1131–32 (codified as amended at 15 U.S.C. § 1681h). Section 1681h(e) provides:

> Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report except as to false information furnished with malice or willful intent to injure such consumer.

Id. § 1681h(e).[4] Plaintiff argues that WaMu reported the false loan information to the CRAs "with malice;" therefore, section 1681h(e) authorizes her UDTPA claim under section 75-1.1. In making this argument, plaintiff contends that section 1681h(e) conflicts with section 1681t(b)(1)(F) and that this court should reconcile this alleged conflict in her favor by holding that section 1681h(e) trumps section 1681t(b)(1)(F).

In order to assess plaintiff's argument under section 1681h(e), the court first must determine whether section 1681h(e) even applies to plaintiff in the context of her UDTPA claim under section 75-1.1. If section 1681h(e) does not apply to her UDTPA claim under section 75-1.1 for WaMu's

---

[4]As part of the 1996 amendments to the FCRA, Congress added the phrase "or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report" to section 1681h(e). See § 2408, 110 Stat. at 3009-439; cf. Thornton, 619 F.2d at 703 n.2 (quoting pre-1996 version of section 1681h(e)).

9

alleged reporting of false loan information, then (by definition) it cannot conflict with section 1681t(b)(1)(F).

The court begins its analysis with the language of section 1681h and the statutory provision cross-referenced in section 1681h(e). See, e.g., Albernaz v. United States, 450 U.S. 333, 336 (1981) (a court's starting point concerning an issue of statutory construction must be the language of the statute). Congress enacted section 1681h as part of the FCRA in 1970. See § 610, 84 Stat. at 1131–32 (codified as amended at 15 U.S.C. § 1681h). Section 1681h regulates disclosures required under 15 U.S.C. § 1681g that a CRA makes to consumers. See 15 U.S.C. § 1681h. Section 1681g describes the duty that a CRA has to disclose to consumers information in their credit file. See id. § 1681g. Essentially, section 1681h(a) requires a CRA to obtain proper identification from consumers who wish to view information in their file. Id. § 1681h(a)(1). Section 1681h(a)(2) requires the CRA to provide the information to the consumer in writing, unless the consumer otherwise requests. Id. §§ 1681h(a)(2), 1681h(b). The CRA is required to provide trained personnel to explain to the consumer information that is provided under section 1681g of the FCRA, and the consumer is permitted to be accompanied by one other person during such an explanation. Id. §§ 1681h(c), (d).

Section 1681h(e) is entitled "limitation of liability." See id. § 1681h(e). Section 1681h(e) "bars consumers from bringing actions in the nature of defamation, invasion of privacy, or negligence in certain specified contexts, except as those causes of action arise under sections 1681n and 1681o of the FCRA." Sloane v. Equifax Info. Servs., LLC, 510 F.3d 495, 506 n.3 (4th Cir. 2007) (quotation omitted); see Thornton, 619 F.2d at 703–05. Essentially, section 1681h(e) recognizes that when a consumer takes issue with respect to the reporting of information disclosed under certain provisions of the FCRA, the FCRA's statutory scheme calls for the consumer's remedy

10

generally to be found within sections 1681n or 1681o of the FCRA.[5] Section 1681h(e) then contains a general bar (sometimes described as qualified immunity) on a consumer's action in the nature of defamation, invasion of privacy, or negligence "based on information disclosed pursuant to section 1681g, 1681h, or 1681m . . . or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report . . . ." 15 U.S.C. § 1681h(e). Finally, section 1681h(e) contains a narrow exception to the general bar for actions in the nature of defamation, invasion of privacy, or negligence "for false information furnished with malice or a willful intent to injure such consumer." Id.; see, e.g., Thornton, 619 F.2d at 703.

As mentioned, plaintiff concedes that any cause of action that she may have had under sections 1681n or 1681o of the FCRA is barred by the FCRA's two-year statute of limitations. See Pl.'s Mem. 2. She argues that the malice exception to the general bar in section 1681h(e) authorizes her UDTPA claim arising from WaMu's false reporting of loan information to CRAs. Under the plain language in section 1681h(e), however, the general bar on tort actions and the malice/willful intent to injure exception are triggered only in actions "based on information disclosed pursuant to section 1681g, 1681h, or 1681m . . . or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report . . . ." 15 U.S.C. § 1681h(e). Accordingly, the court must examine whether plaintiff's UDTPA claim under section 75-1.1 falls within the statutory language in section 1681h(e).

Sections 1681g and 1681h do not apply to plaintiff's UDTPA claim under section 75-1.1 because those sections apply only to CRAs. Id. §§ 1681g, 1681h; Cousin v. Trans Union Corp., 246 F.3d 359, 367 (5th Cir. 2001) ("Section 1681g pertains to the disclosure of information in a consumer's file to consumers who make a request to a consumer reporting agency."). WaMu is not

---

[5]Sections 1681n and 1681o impose liability for willful or negligent noncompliance with the FCRA. See 15 U.S.C. §§ 1681n, 1681o.

a CRA. See 15 U.S.C. § 1681a(f). It is a furnisher of information. As for section 1681m, section 1681m applies to "users" of consumer reports. See id. § 1681m. Based on the allegations in plaintiff's UDTPA claim under section 75-1.1, WaMu is not such a "user" vis-a-vis plaintiff. Rather, Ross alleges that WaMu provided false information to CRAs with malice and that WaMu is liable for providing such information under section 75-1.1 of the UDTPA. Finally, plaintiff's UDTPA claim under section 75-1.1 does not allege that WaMu used her consumer report or that WaMu took adverse action based on information contained in her consumer report or disclosed by a user of her consumer report. Cf. id. § 1681h(e). Accordingly, 1681h(e) does not apply to plaintiff's UDTPA claim under section 75-1.1. Moreover, simply attaching the word "malice" to plaintiff's UDTPA claim under section 75-1.1 is not sufficient to make that claim fall within the statutory language in section 1681h(e).

Because section 1681h(e) does not apply to plaintiff's UDTPA claim under section 75-1.1, there is no conflict between section 1681h(e) and section 1681t(b)(1)(F). See, e.g., Johnson v. JP Morgan Chase Bank, 536 F. Supp. 2d 1207, 1214–15 (E.D. Cal. 2008); Knudson v. Wachovia Bank, 513 F. Supp. 2d 1255, 1258–60 (M.D. Ala. 2007); Leet v. Cellco P'ship, 480 F. Supp. 2d 422, 429–30 (D. Mass. 2007); Islam, 432 F. Supp. 2d at 193–94. Thus, as explained earlier, section 1681t(b)(1)(F) preempts plaintiff's UDTPA claim under section 75-1.1. Accordingly, defendant's motion for summary judgment is granted as to plaintiff's UDTPA claim under section 75-1.1 for WaMu's alleged reporting of false loan information.[6]

---

[6]Because section 1681h(e) does not apply to plaintiff's UDTPA claim under section 75-1.1, the court need not resolve the "complex question" regarding the relationship between section 1681h(e) and 1681t(b)(1)(F). See Beyer v. Firstar Bank, N.A., 447 F.3d 1106, 1108 (8th Cir. 2006) (recognizing differing approaches among the district courts to address the relationship between sections 1681t(b)(1)(F) and 1681h(e)); see also Lofton-Taylor v. Verizon Wireless, 262 F. App'x 999, 1002–03 (11th Cir. 2008) (per curiam) (unpublished); cf. Tracy Bateman Farrell, Annotation, Preemption of State Law by Fair Credit Reporting Act, 8 A.L.R. Fed. 2d 233 (2006) (collecting some 200 district court cases that have considered the relationship between section 1681t(b)(1)(F) and 1681h(e)). Notably, no Court of Appeals has addressed the relationship between section 1681h(e)

B.

The court next considers plaintiff's UDTPA claim under Article 2 of the UDTPA — the

NCDCA — for WaMu's alleged unfair debt collection practices.[7] Under North Carolina law, "[i]f

the abusive conduct alleged pertains only to debt collection, the NCDCA provides a claimant's

exclusive remedy." DIRECTV, Inc. v. Cephas, 294 F. Supp. 2d 760, 765 (M.D.N.C. 2003)

(emphasis added). The NCDCA prohibits a "debt collector" from using unfair debt collection

practices, including the use of threats, coercion, harassment, unreasonable publications of the

consumer's debt, deceptive representations, or other unconscionable means to collect a "debt" from

a "consumer." See, e.g., Davis Lake Cmty. Ass'n v. Feldman, 138 N.C. App. 292, 295–97, 530

S.E.2d 865, 868–69 (2000) (describing elements of NCDCA claim). An NCDCA claim also must

meet the generalized requirements of UDTPA claims: (1) an unfair act, (2) in or affecting

---

and 1681t(b)(1)(F). For a summary of the three approaches used by the districts courts to resolve the relationship between section 1681h(e) and section 1681t(b)(1)(F), see Barnhill v. Bank of America, N.A., 378 F. Supp. 2d 696, 699–704 (D.S.C. 2005).

Finally, although neither party discussed the case, this court has reviewed the Fourth Circuit's unpublished opinion in Beattie v. Nations Credit Financial Services Corp., 69 F. App'x 585, 590 (4th Cir. 2003) (per curiam) (unpublished). In Beattie, the Fourth Circuit considered a mortgagor's section 1681h(e) libel claim against a mortgagee for submitting false information to CRAs. See 69 F. App'x at 590–91. The Fourth Circuit considered whether the mortgagee had acted with malice as defined under South Carolina law, concluded that there was no evidence that the mortgagee had acted with malice, and affirmed summary judgment for the mortgagee. See id. The Fourth Circuit did not discuss whether section 1681t(b)(1)(F) otherwise preempted the mortgagor's libel claim. See id. Nor did the Fourth Circuit reference the statutes in section 1681h(e) — i.e., sections 1681g, 1681h, and 1681m — that apply only to CRAs and users of consumer reports. See id. In sum, Beattie does not shed light on the viability of plaintiff's argument that section 1681h(e) authorizes her UDTPA claim under section 75-1.1.

[7]WaMu does not argue that the FCRA preempts plaintiff's NCDCA claim, and this court agrees that the FCRA does not preempt plaintiff's NCDCA claim. See, e.g., Johnson v. MBNA Am. Bank Nat'l Ass'n, No. Civ. 1:05CV150, 2006 WL 618077, at *8 (M.D.N.C. Mar. 9, 2006) (unpublished) (considering plaintiff's UDTPA claim under the NCDCA despite finding that section 1681t(b)(1)(F) preempted plaintiff's UDTPA claim under section 75-1.1); Schade v. MBNA Am. Bank, N.A., No. Civ. 3:04CV633-H, 2006 WL 212147, at *7–*8 (W.D.N.C. Jan. 26, 2006) (unpublished) (same).

13

commerce, (3) that has proximately caused plaintiff injury. See, e.g., id. (emphasis added). Under North Carolina law, the proximate cause of an injury is a factual question, and there may be more than one proximate cause of an injury. See, e.g., Martin v. Smith, 534 F. Supp. 804, 806 (W.D.N.C. 1982). To survive a summary judgment motion, a non-movant's evidence with respect to the cause of an injury "must be fact-specific and not merely speculative." Driggers v. Sofamor, S.N.C., 44 F. Supp. 2d 760, 765 (M.D.N.C. 1998). If there are multiple possible causes for an injury, the plaintiff "must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough . . . ." Id. (quotation omitted & emphasis added). Moreover, for certain medical injuries, "[w]here the exact nature and probable genesis of . . . [the] injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury." Id. (quotation omitted).

Plaintiff alleges that WaMu's debt collection practices caused a plethora of non-economic and economic damages, including emotional distress, numerous health problems, lost income, and lost business opportunities. See Compl. ¶ 30. As explained below, the court grants defendant's motion for summary judgment on plaintiff's NCDCA claim. Simply stated, under North Carolina law, plaintiff fails to present evidence from which a reasonable jury could find that WaMu's actions proximately caused her damages.

1.

With respect to non-economic injuries, Ross alleges that WaMu's actions caused her to suffer numerous physical ailments, including PTSD, sleep apnea, insomnia, ulcers, migraine headaches, and a narrowing of her esophagus. See Pl.'s Resp. to Interrogs. 11–14; Second Ross Dep. 155:17–156:3. However, all of the physicians who examined or treated Ross for these conditions

14

have concluded that something other than WaMu's alleged conduct caused Ross' problems or that her medical conditions were of unknown origin.

Specifically, Dr. Bochacki treated Ross for PTSD and depression, and concluded that it was "definitely [a] diagnosis based on trauma with [the] Charlotte-Mecklenburg [school] system." Dr. Bochacki Dep. 68:15–18, 29:15–30:14, 40:1–13, 46:3–19. Dr. Kenneth Ashkin treated Ross for sleep apnea and insomnia. Dr. Ashkin concluded that Ross' sleep apnea was caused by obesity and an elongated palate, and that her insomnia was caused by sleep apnea and periodic limb movement disorder (the cause of which is "unknown"). See Def.'s Mot. for Summ. J. Ex. T, Dr. Ashkin Dep. 36:21–38:24, Sept. 20, 2007 [hereinafter "Dr. Ashkin Dep."]. Dr. Sara Beyer treated Ross for migraine headaches and ulcers. Dr. Beyer concluded that Ross' ulcers were caused by a bacterial infection from foods Ross had eaten. See Def.'s Mot. for Summ. J. Ex. U, Dr. Beyer Dep. 31:5–12, 33:9–34:7, Sept. 21, 2007 [hereinafter "Dr. Beyer Dep."]. Dr. Beyer could not give an opinion to a degree of medical certainty with respect to the cause of Ross' migraine headaches, largely because migraines may have many possible causes and may share some of the symptoms of sinus headaches. See id. at 26:23–27:18, 59:12–60:23. Finally, Dr. Fred Fowler treated Ross for esophagal problems and concluded that Ross' motility disorder was "idiopathic" (i.e., arising from an unknown cause). See Def.'s Mot. for Summ. J. Ex. W, Dr. Fowler Dep. 19:17–21:6, 49:19–50:15, Oct. 4, 2007 [hereinafter "Dr. Fowler Dep."]. Notably, in her 21 visits to Dr. Bochacki, Ross did not mention WaMu or any credit-reporting problems. See Dr. Bochacki Dep. 73:11–75:13. Ross first mentioned the subject on the day before Dr. Bochacki's deposition. See id. Additionally, Ross never mentioned WaMu or credit-reporting problems to any of her other doctors. See Dr. Ashkin Dep. 41:9–20; Dr. Beyer Dep. 51:8–19; Dr. Fowler Dep. 55:1–19.

Apparently in recognition of this devastating medical evidence from her own doctors and the governing standard under North Carolina law, plaintiff argues that medical expert testimony is not necessary to prove emotional distress damages because "she is in an epistemologically privileged

15

position" and that "by virtue of being herself, she knows better than anyone else what she has suffered in her own mind and body." Pl.'s Mem. 22. In support, plaintiff cites two section 1983 cases (Randall v. Prince George's County, 302 F.3d 188, 208 (4th Cir. 2002), and Price v. City of Charlotte, 93 F.3d 1241, 1254 (4th Cir. 1996)) for the proposition that a litigant's testimony, standing alone, may support a claim for emotional distress damages. In Randall and Price, the Fourth Circuit recognized that a plaintiff's testimony standing alone could support an award of compensatory damages for emotional distress based on a constitutional violation brought under 42 U.S.C. § 1983. See Price, 93 F.3d at 1254; Randall, 302 F.3d at 208–09 (citing Price). However, the Fourth Circuit emphasized that such evidence "must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; . . . conclusory statements that the plaintiff suffered emotional distress . . . [do not] support[] an award of compensatory damages." Price, 93 F.3d at 1254; see Randall, 302 F.3d at 208–09 (citing Price). Moreover, the Fourth Circuit has repeatedly warned that claims of emotional distress are "'fraught with vagueness and speculation'" and are "'easily susceptible to fictitious and trivial claims.'" Sloane, 510 F.3d at 503 (quoting Price, 93 F.3d at 1250).

Plaintiff presents no evidence (other than her own conclusory statements) showing that WaMu's alleged debt collection practices were a substantial factor in causing her ailments. In light of the overwhelming, contradictory medical evidence, Ross' speculation fails to show proximate cause under North Carolina law. Cf. Driggers, 44 F. Supp. 2d at 765 (applying North Carolina law); Martin, 534 F. Supp. at 806 (same). Even if the court were to apply the seemingly more generous standard from the section 1983 context, Ross' allegations are conclusory and wilt under the weight of the medical evidence. Based on the evidence in the record, no reasonable jury could find that WaMu's alleged actions proximately caused Ross' non-economic injuries. Cf. Anderson, 477 U.S. at 252 (mere existence of a scintilla of evidence not enough to avoid summary judgment); Goldberg

16

v. B. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988) (court need not accept conclusory statements or naked opinions in order to avoid summary judgment).

2.

Plaintiff also alleges numerous economic injuries, including lost wages, failure of a teaching certification exam, resignation from her position as a board member on the Community Development Corps ("CDC"), and a lost business opportunity to open a senior assisted-living facility. See Compl. ¶ 30; Pl.'s Resp. to Interrog. 15–16. Again, first principles of proximate cause under North Carolina law doom plaintiff's claim. No reasonable jury could find that WaMu's debt collection practices proximately caused any economic damage to Ross.

With respect to lost wages, including yearly progression pay, the evidence shows that Ross stopped working for CMS because she went on disability for carpal tunnel syndrome and PTSD, conditions which she claimed the school system caused. See Second Ross Dep. 13:10–14:23, 27:14–28:25 & Ex. 5 (compromise settlement agreement and release dated Aug. 23, 2005). With respect to Ross' failure of a teaching certification exam, Ross admits that WaMu's alleged actions did not prevent her from taking the exam. Id. at 183:1–3, 191:17–24. Ross also admits that she did not study for the exam, did not take a practice exam, took the exam one time, and did not appeal her exam results. Id. at 188:10–20, 192:14–22. Additionally, Ross does not know what percentage of test-takers passed the exam. Id. at 187:2–22. With respect to damages related to her resignation from the CDC board, Ross admits that the foreclosure of the mortgage caused her to resign and that such foreclosure was proper. See Pl.'s Mem. 1, 9, 12; First Ross Dep. 212:3–213:9. Simply put, WaMu's debt collection practices did not proximately cause these alleged damages.

Lastly, Ross fails to show that WaMu's debt collection practices proximately caused her to lose annual business profits of over $3,000,000 from a start-up senior assisted-living facility. Notably, the gravamen of Ross' lost profits claim stems from her inability to obtain credit because of WaMu's alleged reporting of false loan information, *not* WaMu's debt collection practices. See

17

Second Ross Dep. 226:1–227:15. However, as discussed, the FCRA preempts Ross' UDTPA claim to the extent it is based on alleged reporting of false loan information, and Ross concedes that a direct action under the FCRA is time-barred. See Pl.'s Mem. 2. Thus, the court must view Ross' allegations of lost profits in the context of her NCDCA claim. Viewed in this light, Ross' claim that WaMu's debt collection practices caused her to lose $3,000,000 per year in lost profits evaporates.

Under North Carolina law, the party seeking lost profits bears the burden of proof, and to meet that burden, a party "must prove such losses with 'reasonable certainty.'" McNamara v. Wilmington Mall Realty Corp., 121 N.C. App. 400, 407, 466 S.E.2d 324, 329 (1996); see Olivetti Corp. v. Ames Bus. Sys., Inc., 319 N.C. 534, 546, 356 S.E.2d 578, 585 (1987); Castle McCulloch, Inc. v. Freedman, 169 N.C. App. 497, 501, 610 S.E.2d 416, 420 (2005); Iron Steamer, Ltd. v. Trinity Restaurant, Inc., 110 N.C. App. 843, 847, 431 S.E.2d 767, 770 (1993). Whether a party's evidence meets the "reasonable certainty" standard is a question of law for the court. Olivetti, 319 N.C. at 548, 356 S.E.2d at 586–87; Iron Steamer, 110 N.C. App. at 848, 431 S.E.2d at 770–71. Although absolute certainty is not required, "damages for lost profits will not be awarded based on hypothetical or speculative forecasts." Castle McCulloch, 169 N.C. App. at 501, 610 S.E.2d at 420; see McNamara, 121 N.C. App. at 407–08, 466 S.E.2d at 329–30; Iron Steamer, 110 N.C. App. at 847, 431 S.E.2d at 770. "While difficult to determine, 'damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analysis, and business records of similar enterprises.'" Iron Steamer, 110 N.C. App. at 849, 431 S.E.2d at 771 (quoting Restatement (Second) of Contracts § 352, cmt. b; emphasis removed).

In support of her $3,000,000 damages figure, Ross offers the following evidence: (1) a self-prepared sales forecast, see Pl.'s Opp'n to Summ. J. Ex. 1, Assisted-Living Facility Documents 1 [hereinafter "ALF-__"]; (2) a schedule of standard adult care home daily reimbursement rates, see ALF-2; (3) a fire inspection report for Ross' home, see ALF-3; (4) a county health inspection report

18

for Ross' home, see ALF-4;[8] (5) a letter of encouragement from City of Charlotte Councilman, Malcolm Graham, see ALF-5; and (6) a North Carolina Department of Human Resources certificate of completion for the rules exam required for assisted-living facility administrators. See ALF-6.

Ross has not retained an expert to testify concerning damages, and fails to submit economic data, market surveys and analysis, or business records of similar enterprises. See Iron Steamer, 110 N.C. App. at 849, 431 S.E.2d at 771. Instead, Ross proffers her own opinion about projected profits, even though she has never run a business and has limited experience in the adult care field. See Second Ross Dep. 9:9–10:22, 232:24–233:4, 251:7–253:13. Ross' lost-profit estimate rests on several unsupported assumptions, including: (1) that she could fill the 140-bed facility with paying residents; (2) that she would receive a HUD grant; and (3) that she would receive money from private investors. See id. at 231:3–21, 234:4–236:21, 247:23–249:25. Even in her brief, Ross admits that she cannot articulate damages with reasonable certainty and states that her loss "may not have been $3 million a year of pure profit, but it was something." See Pl.'s Mem. 21–22.

Based on the evidence, the court concludes that no reasonable jury could find that WaMu's actions proximately caused Ross any economic damages. Defendant's motion for summary judgment is granted with respect to plaintiff's NCDCA claim.

3.

Lastly, plaintiff argues that the NCDCA permits statutory damages for unfair debt collection practices, regardless of proximate cause. See Pl.'s Mem. 24. Moreover, Ross argues that each violation of the NCDCA — that is, each collection call placed by WaMu — yields a separate penalty of up to $2000. See id. at 25. In support, plaintiff cites the Fair Debt Collection Practices Act, 15

---

[8]The health inspection report approved only four residents for the Munsee Street property. See ALF-4. This evidence stands in stark contrast to the 140-bed facility Ross claims she would have operated. Second Ross Dep. 230:16–231:4.

U.S.C. § 1692k(a)(2)(A), and the North Carolina Collection Agency Act, N.C. Gen. Stat. § 58-70-130(b), and analogizes these statutes to N.C. Gen. Stat. § 75-56, which states:

> The specific and general provisions of this Article shall exclusively constitute the unfair or deceptive acts or practices proscribed by [N.C. Gen. Stat.] 75-1.1 in the area of commerce regulated by this Article. Notwithstanding the provisions of [N.C. Gen. Stat.] 75-15.2 and [N.C. Gen. Stat.] 75-16, in private actions or actions instituted by the Attorney General, civil penalties in excess of two thousand dollars ($2,000) shall not be imposed, nor shall damages be trebled for any violation under this Article. . . .

N.C. Gen. Stat. § 75-56. Plaintiff seeks to import the damages provision of the Fair Debt Collection Practices Act, see 15 U.S.C. § 1692k(a)(2)(A), into section 75-56 and thereby receive damages for each WaMu phone call. See Pl.'s Mem. 25–26. Not surprisingly, plaintiff cites no cases adopting this novel interpretation of section 75-56.

Unfortunately for plaintiff, the case law does not support her position. First, section 75-56 does not eliminate the requirement that a plaintiff show proximate cause and actual injury. See, e.g., Reid v. Ayers, 138 N.C. App. 261, 265–66, 531 S.E.2d 231, 235 (2000) (concluding that section 75-76's reference to section 75-1.1 implies that the legislature intended the NCDCA to be governed by the generalized provisions of UDTPA). Second, if plaintiff could overcome the hurdle of proximate cause (which she cannot for the reasons stated earlier), section 75-56 imposes a cap on damages for a violation of the NCDCA, and does not impose a per violation penalty. See, e.g., Holloway v. Wachovia Bank & Trust Co., 339 N.C. 338, 342 & n.2, 452 S.E.2d 233, 235 & n.2 (1994).

V.

Finally, the court examines plaintiff's defamation claim. Plaintiff concedes that summary judgment is proper on several of the alleged defamatory statements, including WaMu's letter to HUD dated July 27, 2001, and all communications that were part of the foreclosure proceedings. See Pl.'s Mem. 19; Def.'s Mem. in Supp. of Mot. for Summ. J. 27–30; Pl.'s Resp. to Interrogs. 10–11. Plaintiff also concedes that summary judgment is proper on all alleged defamatory statements made

20

before May 21, 2003. See Pl.'s Mem. 27. Thus, plaintiff bases her defamation claim on messages that WaMu left at plaintiff's work between May 21, 2003, and November 2003, and WaMu's alleged reporting of false loan information to the CRAs, which ceased no later than December 31, 2003. See Pl.'s Resp. to Interrogs. 10–11; First Ross Dep. 120:14–22; Second Ross Dep. 135:3–138:3.

Plaintiff filed suit on August 22, 2006, and WaMu argues that the one-year statute of limitations in N.C. Gen. Stat. § 1-54(3) bars this claim. In order to avoid the one-year statute of limitations in section 1-54(3), plaintiff cites the savings provision of North Carolina Rule of Civil Procedure 41, N.C. Gen. Stat. § 1A-1, and a lawsuit that she filed against WaMu in Mecklenburg County Superior Court on May 21, 2004, and voluntarily dismissed on August 25, 2005. Under Rule 41, a plaintiff may dismiss her action, without prejudice, at any time before resting her case. See N.C. R. Civ. P. 41(a). Further, "[i]f an action commenced within the time prescribed therefor, or any claim therein, is dismissed without prejudice . . . , a new action based on the same claim may be commenced within one year after such dismissal . . . ." Id. This provision effectively extends the statute of limitation of any claim alleged in the original complaint by one year after a plaintiff takes a voluntary dismissal. See, e.g., Staley v. Lingerfelt, 134 N.C. App. 294, 298, 517 S.E.2d 392, 395 (1999). In order to invoke Rule 41's savings provision, courts applying North Carolina law "require[] the strictest factual identity between the original claim and the new action . . . ." Brannock v. Brannock, 135 N.C. App. 635, 639, 523 S.E.2d 110, 113 (1999) (citations & quotations omitted). "[B]oth claims must be substantially the same, involving the same parties, the same cause of action, and the same right." Id. at 640, 523 S.E.2d at 113 (quotation omitted). "If the actions are fundamentally different or not based on the same claims, the new action is not considered a continuation of the original action, and Rule 41(a) may not be invoked." Id. (citations, quotations & alteration in the original omitted).

Plaintiff argues that her May 21, 2004 lawsuit put WaMu on notice that she was suing for false information published by WaMu after May 21, 2003, and that the savings provision of Rule

41 applies to her defamation claim because she voluntarily dismissed the May 21, 2004 lawsuit without prejudice and filed the current action based on the same claims within one year of her dismissal. See Pl.'s Mem. 2. In support, plaintiff cites the following allegations from her May 21, 2004 complaint:

7. On or about September 11, 2001, Plaintiff discovered a [sic] that a negative credit notation had been placed on her credit reports by Washington with regards to the outstanding loan obligation on the Property. Shortly thereafter, agents of Washington informed Plaintiff that James Williams had been relieved of his obligation on the referenced Note and Deed of Trust, and that Plaintiff was now the primary obligor on same.

8. At all times subsequent to September 11, 2001, continuing through the present, Plaintiff has consistently maintained to Washington that Plaintiff was not contractually obligated to Washington to pay the referenced Promissory Note and Deed of Trust.

9. Some time prior to December 15, 2003, upon information and belief, Washington represented to the U.S. Department of Housing and Urban Development that Plaintiff was the mortgagor with respect to the Property (FHA Case No. [redacted] 9191). At the time that Washington made this representation, Washington knew or should have known that Plaintiff had never legally obligated herself as the mortgagor with respect to the Property, and thus knew or should have known that this representation was false.

May 2004 Compl. ¶¶ 7–9. Plaintiff also argues that these allegations put WaMu on notice that she alleged willful false reporting with sufficient knowledge of falsity to establish malice. See Pl.'s Mem. 20.

Rule 41's savings provision does not resuscitate plaintiff's defamation claim for numerous reasons. First, plaintiff's May 2004 complaint does not allege a timely defamation claim concerning messages left by WaMu at plaintiff's work or WaMu's statements to the CRAs concerning plaintiff's credit. Broadly construed, plaintiff's May 2004 complaint alleges that WaMu made defamatory statements to the CRAs before September 11, 2001, which resulted in a negative trade line being placed on plaintiff's credit reports. See May 2004 Compl. ¶ 7. Had plaintiff not taken a voluntary dismissal in the May 2004 lawsuit, the statute of limitations would have barred plaintiff's defamation claim because WaMu allegedly made the statements more than one year before plaintiff filed her

22

complaint. See N.C. Gen. Stat. § 1-54(3). Rule 41 "may not be used to manipulate the statute of limitations of claims that were already time-barred" when initially filed. Strawbridge v. Sugar Mountain Resort, Inc., 243 F. Supp. 2d 472, 477 (W.D.N.C. 2003); Staley, 134 N.C. App. at 298, 517 S.E.2d at 395.

Moreover, Rule 41's savings provision does not apply because the claims alleged in plaintiff's May 2004 action and the August 2006 action are not substantially the same, do not necessarily involve the same parties, and are not the same cause of action. Plaintiff's May 2004 complaint alleged violations of UDTPA and the NCDCA, and did not include a defamation claim that is substantially the same as the one remaining in this case.

Further, the North Carolina Court of Appeals' decision in Stutts v. Duke Power Co., 47 N.C. App. 76, 266 S.E.2d 861 (1980), is materially indistinguishable and neuters plaintiff's reliance on Rule 41(a). See id. at 79–80, 266 S.E.2d at 864. In sum, Rule 41's savings provision does not apply, and Ross' defamation claim is time-barred. Accordingly, defendant's motion for summary judgment is granted as to plaintiff's defamation claim.[9]

## VI.

In conclusion, the court grants defendant's motion for summary judgment. Plaintiff concedes that summary judgment is proper on her FCRA claim. With respect to plaintiff's UDTPA claim, the FCRA preempts the claim to the extent it is based on defendant's alleged reporting of false loan information. To the extent plaintiff alleges a UDTPA claim based on defendant's alleged unfair debt collection practices, plaintiff fails to show that defendant proximately caused her damages. Finally, plaintiff concedes that summary judgment is proper as to a portion of her defamation claim. The remainder of her defamation claim is barred by the statute of limitations, and the savings provision under North Carolina Rule of Civil Procedure 41 does not apply. Accordingly, defendant's motion

---

[9]In light of this disposition, the court need not determine whether the FCRA preempts all or some of Ross' defamation claim.

for summary judgment is GRANTED, and the action is DISMISSED. The clerk is DIRECTED to close this case.

SO ORDERED. This __2__ day of July 2008.

JAMES C. DEVER III
United States District Judge